Khadijah SHARIF, by her mother and next friend, Amida SALAHUDDIN, et al., individually and on behalf of all others similarly situated, Plaintiffs,

v.

NEW YORK STATE EDUCATION DEPARTMENT; and Thomas Sobol, Commissioner of Education, in his official capacity, Defendants.

No. 88 Civ. 8435 (JMW).

United States District Court, S.D. New York.

Feb. 3, 1989.

As Amended Feb. 7, 1989.

---

Isabelle Katz Pinzler, Kary Moss, Deborah Ellis, Joan Bertin, Women's Rights Project, American Civil Liberties Union Foundation, (Helen Hershkoff, John A. Powell, of counsel, American Civil Liberties

Union), Vivenne W. Nearing, Robert Lewin, Madelaine R. Berg, Elizabeth A. Sherwin, Lisa Rosenthal, Mary S. Feinstein, Regan A. Shulman, Stroock & Stroock & Lavan, Robert M. Levy, New York Civil Liberties Union, New York City, for plaintiffs.

Marion R. Buchbinder, Anne B. Ehrenkranz, Asst. Attys. Gen., New York City, for defendant.

Richard Hamburger, Block, Amelkin & Hamburger, Smithtown, N.Y., for amicus Hewlett School Dist.

John F. Cannon, Edward W. Keane, Henry Christensen III, Sullivan & Cromwell, New York City, Howard P. Willens, Christopher R. Lipsett, Edward J. Janger, Michael S. Rabb, Wilmer, Cutler & Pickering, Washington, D.C., for amici College Bd. and Educational Testing Service.

## OPINION AND ORDER

WALKER, District Judge:

This case raises the important question of whether New York State denies female students an equal opportunity to receive prestigious state merit scholarships by its sole reliance upon the Scholastic Aptitude Test ("SAT") to determine eligibility. To the Court's knowledge, this is the first case where female students are seeking to use the federal civil rights statute prohibiting sex discrimination in federally-funded educational programs to challenge a state's reliance on standardized tests. This case also presents a legal issue of first impression: whether discrimination under Title IX can be established by proof of disparate impact without proof of intent to discriminate.

After careful consideration, this Court finds that defendants are discriminating against female plaintiffs and their putative class in violation of Title IX and the equal protection clause of the U.S. Constitution. For the reasons set forth below, this Court

enjoins the State Education Department and its Commissioner from awarding the merit scholarships at issue solely on the basis of the SAT.

### I. The Present Action

In November, 1988, plaintiffs—ten high school students, individually and behalf of all others similarly situated, and two organizational plaintiffs [1]—brought an action for declaratory and injunctive relief against the State Education Department ("SED") and Commissioner of Education Thomas Sobol, in his official capacity, alleging that New York's exclusive reliance on the SAT to award Empire and Regents scholarships discriminates against female students in violation of the equal protection clause of the Fourteenth Amendments to the U.S. Constitution, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, as amended by the Civil Rights Restoration Act of 1987, Pub.L. 100–259, and the regulations pursuant to Title IX, 34 CFR Part 106. Plaintiff's proposed class is composed of "all female high school seniors in New York State who are or will be applicants for Regents College Scholarships and Empire State Scholarships of Excellence." Am. Complaint at ¶ 4.[2]

In essence, plaintiffs contend that the SED's reliance upon the SAT disproportionately impacts female students without advancing the legislature's purpose of recognizing and awarding superior high school achievement. Plaintiffs argue: "(1) the SAT was not designed to measure academic performance and achievement, and cannot appropriately be put to that use, (2) but even if it did, the SAT discriminates against female applicants for scholarships, because it underpredicts academic performance for females as compared to males." P.Mem. at 5.

On December 21, 1988, plaintiffs filed an order to show cause as to why this Court should not issue a preliminary injunction

1. The students bring the suit by their parents and next friends. The organizational plaintiffs are the Girls Clubs of America and National Organization for Women.

2. References are made as follows: Amended Complaint ("Am. Complaint); Affidavit ("Aff.");

Testimony of Witness at January 23, 1989 hearing before this Court ("Witness T."); Exhibits ("Ex."); Plaintiffs' Memorandum ("P.Mem."); Plaintiff's Reply Memorandum (P. Reply Mem."); Plaintiff's Appendix ("P.App."); Defendants' Memorandum ("D.Mem.").

enjoining SED's practice of exclusive reliance on SAT scores in awarding Regents and Empire scholarships. On that date, in a conference before this Court, defendants represented that, to cover the possibility of an adverse decision that would require the use of grade point averages (variously "GPAs") to determine scholarship eligibility, the SED would commence collection of GPAs immediately.

On January 12, 1989, defendants submitted a cross-motion for an order dismissing the complaint on the grounds that the Court lacks subject matter jurisdiction, that venue is improper, and that the complaint fails to state a claim on which relief can be granted.

On January 23, 1989, at a hearing, the Court accepted amici briefs of the Educational Testing Service ("ETS") and the College Entrance Board, and the Hewlett School District, and heard the testimony of educational testing experts, college deans of admission, and SED administrators with knowledge of the SED's programs of scholarship and testing practices. The Court has carefully examined the submissions of the parties, assessed the credibility of the witnesses and reviewed word by word the hearing transcript.

## II. *Background*

### A. Evolution of New York State Scholarship Awards

New York State, in one of the most extensive merit scholarship programs in the country, each year makes 26,000 academic achievement awards to New York's high school graduates. In order to understand the program's current purpose, a brief recitation of the program's evolution is appropriate.

### 1. *Reliance Upon College Entrance Diplomas and Special Regents Examinations*

New York State's scholarship program began in 1913, when the legislature first awarded 750 Regents Scholarships in the amount of $100 a year for a period of four years. Act approved Apr. 16, 1913, ch. 292, 1913 N.Y. Laws, § 527. At that time, the $100 stipend was sufficient to cover the tuition charged at most colleges in the State.[3] Thus, the award was in the nature of a full scholarship which would promote excellence in education by enabling "the most deserving and meritorious students ... [to] obtain a college or university training, many of whom would be deprived of such education were it not for the wisdom of the State in providing these scholarships."[4]

The 1913 law authorized the State Board of Regents to make all rules governing the award of the scholarships. Ch. 292, 1913 N.Y. Laws § 72. From 1913 until 1944, the State determined scholarship winners based upon the results of general high school Regents examinations, which also were the basis for granting the college entrance diploma. Lott, T. 64.[5]

By 1944, the SED recognized that it could no longer rely solely upon general high school Regents examinations and college entrance diplomas in awarding Regents Scholarships. First, it was hard to rank students based upon the college entrance diploma because it was "difficult under the statute to know just what subjects to take into account in computing the averages of pupils."[6] Second, the nature of the high school general Regents exams had changed. Instead of measuring levels of achievement in the variety of courses taught in high school, the general Regents exams became a test of the bare minimum

---

**3.** *Tenth Annual Report of the Education Department* (March 16, 1914), D.Mem., Ex. 3.

**4.** *Id.* at 30.

**5.** The college entrance diploma was granted to pupils who pursued courses in approved New York secondary schools and passed the Regents examinations prescribed for such diploma. D.Mem. at 7, n. 1.

**6.** *Tenth Annual Report of the Education Department* at 468 (1914), D.Mem. Ex. 3. Moreover, at that time the college entrance diploma was issued in two very different forms—the college entrance diploma in arts and the college entrance diploma in science." *Id.*

that a student needed to know to graduate from high school, and thus was a poor method for sorting students at the top of the spectrum. Lott T. at 73. Faced with these difficulties, in 1944 the SED developed a separate, more challenging Regents scholarship examination. Meno Aff. ¶ 2. The examination, in use for the next twenty years, was divided into two equal parts—aptitude and achievement—and was six hours long. Lott T. at 68.

In 1974, New York State's scholarship program changed dramatically following a revaluation by a Select Committee on Higher Education. At the time the Regents scholarship program provided an annual award of $1,000 to a limited number of highly qualified students. The Committee found that the legislature's goal of substantially funding students' college educations as an incentive for select students to attend college was no longer being met.[7] The Committee found that the Regents scholarship examinations "can be criticized for actually rewarding the family background and upbringing that enables students to study and perform well, rather than an objective kind of merit." [8]

Prompted by these concerns, the legislature restructured its awards, creating two types of awards: first, "general awards" which provide substantial monetary assistance, and second, "academic performance awards" which recognize achievement. Act of 1974, ch. 942, N.Y. Laws §§ 604, 605. Classifying Regents Scholarships as "academic performance awards," the legislature reduced the awards to a stipend of $250, and increased the number of awards to 25,000 to be allocated by county of residence. The legislature created additional awards for the least competitive high schools to enable them to receive at least one for every graduate from that school in the preceding year. Ch. 942, 1974 N.Y. Laws § 605(1).

In the "general awards" category, the legislature created a Tuition Assistance Program ("TAP") to fund college students based upon financial need. The legislature made TAP awards available to all students enrolled in approved programs and are given to those who demonstrate the ability to complete such program's courses, and who satisfy financial need requirements established by the Commissioner of Education. Ch. 942, 1974 N.Y. Laws § 604; N.Y. Educ. Law. § 667(1) and (4) (McKinney 1988 & Supp.1989).

2. *Reliance Upon the SAT*

In 1977, as a cost-cutting measure, the legislature eliminated its funding for the Regents scholarship examinations. P.App. I, Ex. 3. Instead, the legislature directed that the scholarships be awarded on the basis of "nationally established competitive examinations." Act approved Apr. 12, 1977, ch. 63, 1977 N.Y. Laws § 1. The SED considered examinations, including: (1) the SAT; (2) the American College Testing Program ("ACT"); (3) the Preliminary Scholastic Aptitude Test ("PSAT"); and (4) a combination of Achievement Tests, individual tests given in particularized areas of study, including biology, chemistry and foreign languages. Lott T. at 66. While the Achievement Tests measured performance in a wide variety of courses in a high school curriculum, the SED chose not to use them because few students take the exams and the SED did not want to require them to do so for Regents scholarship purposes.[9] The SED similarly rejected the ACT, a test much like the SAT, because few students take the ACT in New York.[10] The PSAT, a shorter version of the SAT given in the junior year of high school, was not considered a viable option because stu-

---

**7.** *Report of the Select Committee on Higher Education,* State of New York Legislative Document, No. 16, p. 9 (1974), D.Mem. Ex. 4.

**8.** *Id.* at 29.

**9.** For example, the most popular Achievement Test is taken by only 25,000 students. Lott T. at 68–69. The SED "felt it would be an imposition on students to require them to pay the additional fee to have to take these College Board achievement tests for scholarship purposes." *Id.*

**10.** The SED, however, allowed a student to use the ACT as an alternative to the SAT, if the sole test that student had taken was the ACT.

dents took it too early in their high school careers.

By process of elimination, then, the SED chose the SAT, the test taken by the greatest number of students.[11] Unlike the Regents scholarship examinations, the entire SAT is labeled an "aptitude" test, and the SAT only purports to test two subjects— Math and English. D.Mem. at 8. Despite the SED's claim that the Regents Scholarship exam and the SAT are very similar, D.Mem. at 9, the State's own witness, Lynn Richbart,[12] testified that about 30% of the SAT questions would not have appeared on the Regents Scholarship exam. Richbart T. at 184. Richbart testified that SAT questions, unlike Regents Scholarship questions, often require that students remember concepts learned in earlier grade levels, or test students on material which is outside the high school curriculum. Richbart T. at 178–182.[13] Moreover, the SAT requires students to be able to answer questions designed specifically for the SAT, such as comparison and logic questions, that are not present on the Regents Scholarship exams. Richbart T. at 182. In addition, the SAT was never designed to test high school achievement. While high school performance may affect a student's performance on the SAT, the SAT does not cover the high school curriculum—indeed there is no standard high school curriculum in New York State—nor has it ever been validated to test achievement in high school. *See* validation discussion *infra.*

In 1986, the legislature created the more selective Empire State Scholarships of Excellence carrying an annual stipend of $2000 to be awarded to the 1,000 highest ranking Regents Scholarship winners. Act approved and effective Apr. 18, 1986, ch. 56, 1986 N.Y. Laws. The Governor's approval memorandum to the legislative bill creating the Empire Scholarship stated the purpose of these new awards as follows:

> The *Empire State Scholarship of Excellence Program will recognize academic achievement* and provide a significant inducement for New York's brightest students to continue their studies in the State. These new scholarships will complement the efforts we are undertaking to acknowledge and enhance the *educational performance* of our brightest youth. (emphasis added).

1986 Legislative Annual, P.App. I, Ex. 3. Like the Regents scholarship, the Empire Scholarship is distributed by county of residence, and is renewable for five years. There is no minimum quota per high school for Empire State Scholarships.

### 3. Reliance Upon SATs and GPAs: The 1987 Experiment

In response to allegations that the SED's practice of relying solely upon the SAT in awarding Regents and Empire State Scholarships discriminated against females who consistently scored below males, the Board of Regents asked the Governor and legislature for $100,000 to develop a new scholarship achievement examination. The legislature declined to fund a special examination but, instead, amended the Education Law to require that the awards be based upon in part upon the student's grade point average ("GPA") as a measure of high school achievement. Senator Kenneth Lavalle, introducing the legislation, explained that the "statute intended to correct a gross inequity that pervaded the New York educational system caused by awarding of Regents College Scholarships and Empire State Scholarships of Excellence based solely on the results of a nationally administered

---

**11.** The SED has attempted to justify its choice by arguing that some studies found a general correlation between scores obtained on the SAT and scores obtained on the now abandoned Regents scholarship scholarship exams. Lott. T. at 67, 70–71. These studies are discredited, however, because they did not draw any distinctions between men and women, but rather grouped them together in examining the correlation between the tests. Lott. T. at 72. For problems

inherent in such a practice, *see infra.* Moreover, like the SAT, the Regents scholarship examinations were not validated as a measure of high school achievement.

**12.** Associate of Bureau of Mathematics Education, SED.

**13.** *See also* Shapiro T. at 44 (Regents questions are more content specific).

standardized examination." [14] Lavalle Aff. ¶ 2, P. Reply Mem., Ex. 7. The SED specified in its announcement of the new legislation to high school principals that the law was changed "[i]n order to provide for a better balance of male and female winners." P.App. I, Ex. 10.

The new legislation, for the first time, expressly stated that awards are to be based on a measure of "high school performance." Act approved and effective Aug. 7, 1987, ch. 837, 1987 N.Y. Laws §§ 1, 2. In doing so, the legislature altered the criteria for scholarship eligibility—on a one-year, experimental basis—to require the SED Commissioner to base awards on a formula which at least includes a measure of high school performance, and which may include nationally established competitive examinations. The amendment also required the Commissioner to "complete a statistical review of the gender, racial and ethnic composition of students awarded such scholarships within sixty days of the announcement of such scholarship award." *Id.* The legislation included a sunset provision that provided that the amendment would automatically lapse after one year if it were not affirmatively extended.

In May 1987, the SED examined possible measures of high school performance that could be used to select scholarship winners equitably. May Hearing at 9. The SED surveyed high school principals for information concerning grade point averages and class rank. *Id.* at 4. The possibility of using class rank as a measure of high school performance was dropped for three reasons: (1) it is not used by all schools; (2) it adversely affects students in highly selective schools; (3) it cannot be used to

compare students from schools of difference size. *Id.* at 19; Lott T. at 72.

The SED also found drawbacks to the use of grade point averages. Because of the volume of scholarship applications it receives yearly, approximately 100,000, the SED would be unable to individually evaluate the GPA information submitted for each candidate as is done by college admission committees. Byrne aff. ¶ 3; Sharrow T. at 133. Also, the SED concluded that it was difficult to convert grade point average information to a common scale because: (1) there is a lack of comparability in the substance of the courses for which grades are given; (2) school grading practices differ from district to district and different grading scales are utilized; (3) schools differ in their practice and philosophy regarding weighing grades in order to take into account course difficulty; and (4) reported grades may reflect grade inflation. Meno Aff. ¶¶ 2–5; Sharrow T. at 129; Meno T. at 140. On the other hand, the SED's survey indicated that there is a great deal of uniformity as to grading scales: 85 percent of the public schools and 73 percent of the private schools used a numerical score of 1–100. Results of High School Survey, P.App. I, Ex. 8.

Despite comparability difficulties, the SED chose to use GPAs as the best available measure of high school achievement. In awarding the Regents and Empire Scholarships for the 1988 graduates, the SED gave equal weight to students' SAT scores and GPAs, as the measure of high school performance. The SED, however, did not issue specific instructions to schools as to how grades should be reported.[15] As a

---

**14.** The State claims that "the primary intent of the legislation is to include a 'measure of high school performance' in the scholarship eligibility criteria because it was believed that high school performance is a better predictor of college performance than are SAT scores." D.Mem. at 10. In support of its claim, the State cites one isolated exchange from the Hearing on the Implementation of Changes in Criteria for Awarding Regents Scholarships and Empire State Scholarships of Excellence, New York State Senate and Assembly Standing Committees on Higher Education, May 25, 1988, pp.

19–21, P.App. I, attachment 4 (hereafter "May Hearing").

**15.** The GPA calculation was to be based upon three years of English, three years of social studies, two years of math, one year of science, and any three-year sequence in the student's major. Lott T. at 103. However, the SED issued no guidelines as to how to compute average GPAs. Kenneth Ormiston, SED Bureau Chief, told one school: "when calculating grade point average, you may use either weighted or unweighted grades." Letter of Nov. 23, 1987, P.App. I, Ex. 11. After receiving "hundreds of

result, some schools reported weighted grades, taking into account course difficulty, while others reported students' grades as they appeared on their transcripts. Hamburger T. at 3–4. Such inconsistent reporting practices touched off a controversy among school administrators who accused each other of cheating in weighting and reporting grades. Meno T. at 139.

In 1988, under the procedure using a combination of grades and SATs weighted equally women received substantially more Regents and Empire Scholarships than in all prior years in which the SAT had been the sole criterion. P.App. I, Ex. 2. In both 1987 and 1988, young women comprised approximately 54 percent of the applicant pool for the scholarship, yet the results in 1988 when grades and SATs were used were markedly different. The results are summarized as follows:

| | Winners of Empire State Scholarships of Excellence | | Winners of Regents College Scholarships | |
|---|---|---|---|---|
| | Males | Females | Males | Females |
| 1988 | 62 | 38 | 51 | 49 |
| 1987 | 72 | 28 | 57 | 43 |

When GPAs were used in 1988, the mean GPAs were: 85 for females and 84.4 for males. P.App. I, Ex. 2.

In May 1988, the legislature held hearings to evaluate the new practice of using both GPAs and SATs. Although use of GPA information reduced the disparity between the number of males and females receiving Scholarships, Commissioner Sobol recommended that the practice be discontinued, as soon as a new scholarship exam was developed, because: (1) use of GPA information put an increased burden on school staff; (2) use of GPA did not provide an equitable way to compare students from different schools; and (3) use of GPA would encourage students to avoid more challenging courses in order to obtain better grades for Scholarship purposes. May

Hearing at 17–18. Sobol requested funds for a new scholarship exam but also recommended that, until a separate Regents Scholarship examination could be established, GPAs continue to be used in conjunction with SAT scores. *Id.*[16]

Despite Commissioner Sobel's recommendation, the legislature allowed to lapse the eligibility calculation "based on a formula which includes high school performance and which may include nationally competitive examinations." The standard thereby reverted to awards "on the basis of nationally established competitive examinations". In the 1988 legislative session, the SED received funds for a new scholarship examination, but has not yet received approval for a developed test. Meno Aff. ¶ 9. In September, 1989, the SED determined that it would award Regents and Empire Scholarships to 1989 high school graduates on the basis of SAT scores alone. It is the SED's sole reliance on SAT scores for 1989 graduates that plaintiffs complain denies them equal protection under the fourteenth amendment to the U.S. Constitution and violates Title IX of the Education Amendments of 1972.

### B. Use of the SAT for Merit Scholarship Awards

#### 1. *ETS Recommendations and States' Practice*

The Educational Testing Service ("ETS") developed the SAT in order to predict academic performance in college. Willingham Aff. at ¶¶ 5–6. The ability of the SAT to serve this purpose has been statistically "validated." Willingham Aff. at ¶¶ 16–19.[17] It is undisputed, however, that the SAT predicts the success of students differently for males and females. Willingham Aff. at 32. In other words, while the

---

phone calls" about computation of grade point averages, one SED official, Jim Brown, wrote to Ormiston, urging that the policy be clarified. Brown Memo at 1, App. I, Ex. 12. However, SED officials did not issue clarifying instructions. *See* Hearings at 82–85.

**16.** The Attorney for the SED addressed the Commissioner's apparent about face at trial by explaining, "[a]t the time the statement was made,

the statute had not yet expired. And he was assuming that if the statute was extended it would be made on a grade point average." T. at 199.

**17.** "Validity refers to the degree to which evidence supports the inference and use of test scores." Title Aff. ¶ 11.

SAT will predict college success as well for males within the universe of males as for females within the universe of females, when predictions are within the combined universe of males and females, the SAT *underpredicts* academic performance of females in their freshman year of college, and *overpredicts* such academic performance for males.[18] The SAT has never been validated as a measure of past high school performance.

Both the ETS and the College Board, which administers the SAT, specifically advise against exclusive reliance upon the SAT, even for the purpose for which the SAT has been validated—predicting future college performance.[19] Instead, ETS researchers recommend that college admissions counselors use a combination of high school grades and test scores because this combination provides the highest median correlation with freshman grades. Title Aff. at ¶¶ 25–29. Additionally, the National Association of College Admission Counselors' ("NACAC") Code of Ethics requires member institutions to refrain from using minimum test scores as the sole criterion for admission, to use test scores in conjunction with other data such as school record and recommendations, and to refrain from using tests in any manner that may discriminate against students.[20] Thus, many colleges refrain from using test scores exclusively to decide admissions questions. *See* Stewart T. at 58–59; Sharrow T. at 122; Behnke Aff. at ¶¶ 2, 7, 8; Mason Aff. at ¶¶ 5, 6, 7.

Notwithstanding ETS and NACAC guidelines recommending against using the SAT as the sole basis on which to award

scholarships or offer admissions, the SED adopted such a policy in 1974. New York State is one of only two states in the nation to rely solely on SAT scores for the award of state-sponsored merit scholarships instead of factoring in other measurements, such as grade point average or high school rank. May Hearing at 54; Lee Aff. at ¶ 3. Most states rely, at least in part, upon GPAs. For instance, California's extensive merit scholarship program, which gives nearly 17,000 awards annually, relies upon self-reported GPAs. Moss Aff. at ¶¶ 1, 3, 5–6.

### 2. *SAT as Measure of High School Performance*

Both the Empire and Regents Scholarships are intended to reward past academic achievement of high school students, and to encourage those students who have demonstrated such achievement to pursue their educations in New York State. Lott T. at 91; Memo Aff. at ¶ 9. It is undisputed, however, that the SAT was developed and validated to serve a different purpose—*predicting* performance *in college.*

Professional standards governing educational testing require statistical analysis ("validation") to be undertaken to ensure that a test is properly used for its intended purpose. Shapiro T. at 51. For example, the American Psychology Association's Standards on Psychological Testing require that "evidence of validity should be presented for the major types of inferences for which the use of a test is recommended." P.App. I, Ex. 6, at 13. Similarly, the College Board requires that tests be validated periodically "to ensure that they

---

18. Emery T. at 47. *See also* Title Aff. at ¶¶ 6, 10–19, 29; Campbell Aff. at ¶¶ 6, 12–17, 20; Behnke Aff. at ¶¶ 2–7. When the regression equation is based on what is called a common regression line (with males and females together), a male and female with the same SAT scores will obtain different grade point averages, with the female's actual grade point average being somewhat higher than her predicted average. The male's actual grade point average will be somewhat lower than that predicted. Campbell Aff. at ¶ 11–14.

19. *See* 1988 Profile of SAT and Achievement Test Takers—National Report p. iii (ETS, 1988),

P.App. I, Ex. 7. The ETS argues only that "it would be incorrect to suggest ... that the College Board and ETS guidelines are the product of any conclusion that the SAT is biased in any way ..." ETS and College Board Amici Brief at 9.

20. Statement by NACAC on the role of Standardized Testing in the College Admission Process, P.App. II, Part 3, Ex. X; Richard Stewart, vice-president of committee for admissions practices, NACAC, T. at 58; NACAC Statement of Principles of Good Practice (December 1988); Burtnett Aff. at ¶ 3.

predict the expected outcome at a level acceptable for the institution's particular purpose." 1987–1988 ATP Guide for High Schools and Colleges. The SED has never validated the SAT for the purpose of measuring high school performance. Lott. T. at 89.[21]

Notwithstanding the absence of validation studies, it is the SED's current position that the SAT provides a good measure of high school performance because it "measures skills and knowledge primarily developed in school." Byrne Aff. ¶ 17. The SED does not dispute that the SAT does not measure performance in all high school courses, but claims merely that the SAT partially tracks high school English and Math courses and thus tests achievement. Lott T. at 89.[22] The SED concedes that the SAT does not measure achievement in other subject matters such as science, social studies, and foreign languages. Moreover, the SED concedes that overall GPAs are a better measure of high school performance than SATs. Lott. T. at 90; *See also* Anastasi, P.App. II, Part 2, Ex. C.

### 3. *Statistical Impact on Men and Women Statewide*

Males have outscored females on the verbal portion of the SAT since 1972, with an average score differential of at least 10 points since 1981. Males have also consistently outscored females on the mathematics portion, with an average differential of at least 40 points since 1967.[23] In 1988, for example, girls scored 56 points lower than boys on the test. The probability that these score differentials happened by chance is approximately about one in a billion and the probability that the result could consistently be so different is essentially zero. *See* Gray Aff. at ¶ 6.

Statisticians have attempted to explain the score differentials between males and females by removing the effect of "neutral" variables[24], such as ethnicity, socioeducational status (parental education), high school classes, and proposed college major. However, under the most conservative studies presented in evidence, even after removing the effect of these factors, at least a 30 point combined differential remains unexplained.[25]

As a result of the State's practice of basing scholarship awards solely upon SAT scores, males have consistently received substantially more scholarships than females. In 1987 for example, males were 47 percent of the scholarship competitors, but received 72 percent of the Empire State Scholarships and 57 percent of the Regents Scholarships.[26] For Empire State Scholarships, these results represent 15.8 standard deviations from the mean; for Regents Scholarships, the difference represents 31.7 standard deviations. In other words, the probability that the Empire Scholarship results would occur by chance is less than one in a billion, and the probability of the

---

**21.** Indeed, without a prescribed curriculum (as in New York State), it would be very difficult to prove the content validity of the SAT. Shapiro T. at 42.

**22.** The SED's claim that the SAT is an achievement test contradicts the position taken by Commissioner Sobol himself, on June 23, 1988 in the *Appeal of Yick Moon Lee.* P. Reply Mem., Ex. 4. In that case, Sobol stated that SAT scores "are a measure of aptitude rather than achievement." (In *Yick Moon Lee,* a student appealed to the Commissioner to enjoin the practice in his school of using a combination of SAT scores and GPA to calculate class rank. Commissioner Sobol ordered that the practice be discontinued because SAT scores do not measure "actual student achievement.")

**23.** *1988 Profile of SAT takers,* The College Board, P.App. I, Ex. 7, p. iii. These undisputed results are summarized in Appendix B, *infra.*

**24.** It is debatable whether all of these factors are indeed "neutral" and do not to some degree reflect systemic sex discrimination.

**25.** Shapiro T. at 50; Willingham Aff., Ex. 6. *See also* Clark and Grady at 18, P.App. II, Part 2, Ex. D; and Gamache and Novick, P.App. II, Part 3, Ex. M.

**26.** According to the SED's own estimates of the 1988–89 competition, 56 percent of the winners of the Regents Scholarship will be male if only SAT results are used to determine scholarship winners despite the fact that 53 percent of all the competitors are female. Statistical review of the Awarding of the 1988 New York State Scholarships (April 1988), p. App. I, Ex. 2.

Regents Scholarship results would occur by chance is even less. Shapiro T. at 29.[27]

### III. *Discussion*

### A. Procedural Issues

At the outset, defendants argue that this Court should dismiss plaintiffs' complaint on three procedural grounds: first, this Court is without authority to issue the relief requested in this case because plaintiffs do not have standing to bring their claims; second, the Court lacks subject matter jurisdiction; and third, venue is improper. The Court will consider each of these arguments in turn.

### 1. *Standing*

In order to establish standing for the purposes of the constitutional "case or controversy" requirement, the general rule is that a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Otherwise, the exercise of federal jurisdiction "would be gratuitous and thus inconsistent with the Article III limitation." *Id.* at 38, 96 S.Ct. at 1924.

More precisely, plaintiffs must demonstrate: (1) that the "interest sought to be protected is within the zone of interests protected or regulated by the statute or constitutional guarantee in question," *Association of Data Processing Service Organizations Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), (2) "injury in fact," and (3) "causation in fact."

Plaintiffs have fulfilled the first standing requirement. The interest sought to be protected—freedom from discrimination in the award of state scholarships—is within the zone of interests to be protected by the fourteenth amendment and Title IX. Education Amendments of 1972, 20 U.S.C. § 1681.

■ The second requirement, injury in fact, is satisfied by a showing of a likelihood of harm, if not actual harm. In *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) the Supreme Court found that a student had standing to challenge a school's allegedly discriminatory admissions policy, not because he could establish that he would have been admitted were it not for the challenged policy, but rather because his *chances* for admission were reduced by the policy. *Id.* at 280–81 n. 14, 98 S.Ct. at 2743 n. 14 (Powell, J., concurring). *See also, McCleskey v. Kemp*, 481 U.S. 279, 295 n. 8, 107 S.Ct. 1756, 1766 n. 8, 95 L.Ed.2d 262 (1987); *Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. at 115, 99 S.Ct. at 1615.

Plaintiffs here allege that their *chances* for winning a state merit scholarship are reduced by the SED's practice of basing such awards solely on SAT scores and that, therefore, they are less likely to receive benefits such as substantial public recognition, an enhanced ability to attract additional scholarships, and an increased opportunity to attend the college or university of their choice.[28] These allegations alone are sufficient to establish "injury in fact."[29]

---

**27.** As statistical significance is generally recognized to be .05 standard deviations from the mean, there is no doubt that these figures are statistically significant. The reason why the regents results are more significant than the Empire results is that sample size greatly affects calculations of standard deviations, and 25,000 Regents awards are given annually as compared to only 1,000 Empires awards.

**28.** *See* Plaintiff's Affidavits, App. II: Bonzon at ¶ 4; Hart at ¶ 3; Lewis at ¶ 5; Sharif at ¶¶ 3, 4;

Sultan at ¶ 2; Greenblatt at ¶¶ 4, 5; Taylor at ¶ 8.

**29.** Defendants argue that plaintiffs do not have standing because some female students' chances of winning scholarships will be reduced if a combination of grades and SATs are used to determine the awards. D.Mem. at 23. This is irrelevant. The fact is that as a group women's chances are improved. Plaintiffs would rarely succeed in educational testing cases if courts accepted defendants argument, because changes

■ Moreover, while plaintiffs need only establish a likelihood of injury, they have shown as to at least three plaintiffs a near certainty of injury if the SED is not enjoined. Defendants concede that plaintiffs Hart, Capodice, and Bozon probably will qualify for Regents Scholarships if eligibility is determined by using equally weighted GPA and SAT scores but will *not* qualify if SAT scores are the sole criterion. T. at 19, 207; Byrne Aff. at ¶ 10. These three plaintiffs alone are sufficient to establish standing to challenge the awarding practices for both Regents and Empire Scholarships since both are awarded from the same list of 25,000 names.[30] Because the claims raised by plaintiffs necessarily implicate the entire system, and any relief would require modification of that system, plaintiffs have standing to challenge both the Regents and Empire Scholarships even though they personally may not be eligible for the latter.

■ The final requirement, causation in fact, necessitates that the injury be both "fairly traceable" to the defendant and "redressable." *Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). As with injury in fact, causation in fact does not require a showing of complete certainty. In the Second Circuit:

> All that is required is a showing that such relief be reasonably designed to improve the *opportunities* of a plaintiff not otherwise disabled to avoid the specific injury alleged. To ask the plaintiffs to show more than that they would 'benefit in a tangible way from the court's intervention,' would be to close our eyes to the uncertainties which shroud human affairs.

*Huntington Branch N.A.A.C.P. v. Town of Huntington,* 689 F.2d 391, 394 (2d Cir. 1982) (emphasis added) (plaintiffs seeking funding to construct housing project had standing to challenge zoning ordinance, even though no federal housing money was presently available).

In the present case, plaintiffs allege that the SED's reliance upon the SAT is the direct cause of their injury. Injunctive relief compelling the SED to use an alternative procedure with a less discriminating effect would redress their grievance. Defendants argue that because variables other than sex might account for the disparate number of women receiving low SAT scores—and, consequently, *not* receiving scholarships—there is no causation. D.Mem. at 23. This, however, is a dispute on the merits of plaintiffs' claim. Standing does not depend on whether plaintiffs actually will prevail. *See e.g., McCleskey,* 481 U.S. 279, 107 S.Ct. 1756.

The fact that some of the named plaintiffs may not receive scholarships if the injunction is granted presents no barrier to this suit. The claim rests on the alleged discriminatory nature of the system as a whole. In analogous circumstances, the Supreme Court held that a black would-be resident had standing to challenge discriminatory zoning practices, because he intended to apply for housing, although he might not actually obtain it. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). Here, as in *Arlington,* if the requested relief is granted, the plaintiffs would no longer suffer the injury complained of. *See also Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (landlords had standing to challenge rent control ordinance when there was a likelihood of enforcement of the ordinance and concomitant probability that rent would be reduced below what some landlords could afford); *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (standing to challenge act limiting liability in the event of a nuclear accident where "substantial likelihood" that construction of plants could not be completed without liability limit).

in *any* test has differing effects on a broad class of plaintiffs.

**30.** The state awards 25,000 Regents scholarships of $250 and 1000 Empire Scholarships of $2000 to the top Regents scholarship winners.

Since we find plaintiffs have sufficiently alleged injury in fact and causation in fact and that plaintiffs are within the requisite zone of interests, we conclude that plaintiff have standing.

### 2. Jurisdiction

■ Defendants argue that this Court lacks subject matter jurisdiction over plaintiffs' equal protection claim against the SED. This argument is wholly meritless.

While it is true that the Eleventh Amendment bars suits against states, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984), the "important exception to this general rule [is that] a suit challenging the constitutionality of a state official's action is not one against the state." *Id.* at 102, 104 S.Ct. at 909. Moreover, Congress has specifically provided that a state shall not be immune from suit under Title IX. 42 U.S.C. § 2000d–7. Thus, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

### 3. Venue

■ Defendants also challenge the venue of this action. They argue that it is more properly brought in the Northern District of New York where the defendants are located. The Court finds this argument unpersuasive.

Venue in this case is governed by 28 U.S.C. § 1391(b), which provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

Where the claim arose in more than one district, "a plaintiff may chose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but not of the plaintiff)—may be assigned as the locus of the claim." *Leroy v. Great Western*, 443 U.S. 173, 185, 99 S.Ct. 2710, 2717, 61 L.Ed.2d 464 (1979).

Applying the *Leroy* holding, in a similar case to this, Judge Sofaer, formerly of this district, held that state security employees could bring suit against state officials in the Southern District. *Cheeseman v. Carey*, 485 F.Supp. 203 (S.D.N.Y.1980). While the state decisions in question had been made in Albany, the court held that the Southern District had a "substantial relationship" to the claim and, thus, the claim "arose" in the Southern District as well the Northern District. *Id.* at 212. In *Cheeseman*, half of the plaintiff class is located in the Southern District and thus, the court concluded, the challenged practice had been "profoundly felt" in the district.

In this case, the effects of the SED's policy have similarly been profoundly felt in the Southern District. Female students attending New York City schools are harmed more than elsewhere by the SED's exclusive reliance on SAT scores because they are even less likely to qualify for their scholarships than their female counterparts throughout the state. Moreover, these students take the SAT in the Southern District. Thus, while plaintiffs' claims also arise in the Northern District, they arise in the Southern District as well.

The Southern District is at least an "equally plausible forum." New York City is more accessible for the many expert witnesses who live outside New York. Amici ETS and College Board have offices in the City. It is not overly burdensome for state officials to travel to New York. Defendants have not demonstrated that evidence would somehow be less accessible if this case is maintained in the Southern District.

Finally, the Court concludes that because speed of disposition is important in this case, the interests of justice weigh against a transfer. This Court is familiar with the detailed facts of the case, and substantial proceedings have already occurred before this Court. *See e.g., Cheeseman, supra*, 485 F.Supp. at 215. This is not a case where plaintiffs may have chosen their place of venue to harass defendants or to avoid precedents in the Northern District. It appears that plaintiffs merely have cho-

sen a forum that is convenient for the named plaintiffs, teenagers who live in the New York City area.

It is well-established that a plaintiff's choice of forum "is entitled to great weight and will not be disturbed except upon a clear-cut showing that convenience and justice for all parties demands that the litigation proceed elsewhere." *Eastern Refractories v. Forty Eight Insulations*, 668 F.Supp. 183, 187 (S.D.N.Y.1987), *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Such a showing has not been made. Accordingly, accordingly defendants' venue motion is denied.

### B. The Preliminary Injunction

The standard for reviewing a request for a preliminary injunction is well established.

In this circuit, a preliminary injunction can be granted if plaintiff shows *irreparable injury*, combined with either a *probability of success on the merits*, or a fair ground for litigation and a balance of the hardships in his favor.

*The Video Trip Corporation v. Lightning Video, Inc.*, 866 F.2d 50, 52 (2d Cir.1989) (emphasis added), *citing Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1987).

■ A court need not certify a class prior to granting a preliminary injunction. Defendants improperly rely upon *Hurley v. Ward*, 584 F.2d 609 (2d Cir.1978), to support their contention that any injunction must be limited to the individual named plaintiffs. *Hurley* is inapposite because it was brought by an individual plaintiff who did not even seek class certification and members of the purported class were not similarly situated.

Contrary to defendants' argument, courts have consistently granted relief that would have a class-wide effect without first certifying a class. Indeed, in this Circuit, courts have held that where a judgment would run to the benefit not only of the named plaintiffs but also of all others similarly situated, as it would here, class designation is "largely a formality." *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). *See also Hurley, supra*, 584 F.2d at 611–612.[31]

Thus, this Court need not certify a class in this case before determining whether plaintiffs have demonstrated the requirements for a preliminary injunction: irreparable harm and a likelihood of success on the merits.[32]

### 1. *Irreparable Harm*

■ Plaintiffs have demonstrated that if the SED is not enjoined from its current practices, they will suffer irreparable harm. Defendants do not dispute that Regents and Empire State scholarships are prestigious awards, and that students benefit from receiving such awards. Rather, they merely argue that Regents scholarships are worth less than Empire scholarships, and because it is unlikely that any of the named plaintiffs would receive Empire awards, plaintiffs have not shown irreparable harm. D.Mem. at 20. This is defendants' standing argument that was dismissed above. To reiterate: first, while named plaintiffs may not receive Empire awards, some members of the putative class would qualify for such awards; second, *all* plaintiffs' chances are reduced by the SED's actions; and third, defendants concede that at least three named plaintiffs will be harmed by the SED's acts. Byrne Aff. ¶ 10.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable inju-

---

**31.** Moreover, the Supreme Court has held in connection with statute of limitations questions that class-wide relief is appropriate unless and until the class is dismissed. *Crown, Cork and Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *American Pipe and Con-* struction Co. v. Utah, 414 U.S. 538, 551, 94 S.Ct. 756, 765, 38 L.Ed.2d 713 (1974).

**32.** While plaintiffs filed a motion for class certification of January 30, 1989, the Court will not consider this motion until defendants' have filed their response.

ry is necessary." *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). Plaintiffs here go further than merely alleging deprivation of a constitutional right—they document the harm that would result if the SED continued its practice of reliance upon the SAT.[33] Thus, plaintiffs clearly have demonstrated "irreparable harm."

## 2. *Likelihood of Success on Merits*
### a. Title IX

■ Plaintiffs invoke the protections provided by Title IX, which prohibits sex discrimination in federally-funded educational programs.[34] Plaintiffs do not claim that defendants have intentionally discriminated against them based on their sex. Rather, they claim that defendants' practice of sole reliance upon SAT scores to award prestigious state scholarships disparately impacts female students. To this Court's knowledge, this is the first disparate impact case challenging educational testing practices under Title IX.[35]

Neither the Supreme Court nor any court in the Second Circuit has determined whether intent must be shown in Title IX cases.[36] This Court, however, is not without substantial guidance. Recognizing that "Title IX was patterned after Title VI of the Civil Rights Act of 1964," *Grove City College v. Bell,* 465 U.S. 555, 566, 104

S.Ct. 1211, 1218, 79 L.Ed.2d 516 (1984) courts examining Title IX questions have looked to the substantial body of law[37] developed under Title VI, 42 U.S.C. § 2000d, which prohibits race discrimination in federally-funded programs, and Title VII, 42 U.S.C. § 2000e, which prohibits discrimination in employment. *See, e.g., Mabry v. State Board of Community Colleges and Occupational Education,* 813 F.2d 311, 317 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Haffer v. Temple University,* 678 F.Supp. 517, 539 (E.D.Pa.1987).

In *Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Supreme Court held that a violation of Title VI itself requires proof of discriminatory intent. However, a majority also agreed that proof of discriminatory effect suffices to establish liability when a suit is brought to enforce the regulations promulgated under Title VI, rather than statute itself. *See also Alexander v. Choate,* 469 U.S. 287, 293–294, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985); *Latinos Unidos de Chelsea v. Secretary of Housing,* 799 F.2d 774, 785 n. 20 (1st Cir.1986).

Plaintiffs' amended complaint explicitly alleges both violations of Title IX and its implementing regulations. This Court

**33.** *See* P. Mem. at 20–23; Bonzon Aff. at ¶ 4; Hart Aff. at ¶ 4; Lewis Aff. at ¶ 5; Mackenzie Aff. at ¶ 3; Sharif Aff. at ¶¶ 3, 4; Sultan Aff. at ¶ 2. Defendants have not disputed these affidavits.

**34.** Title IX provides, in pertinent part:
(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving any federal assistance.
20 U.S.C. § 1681(a). Recently, Congress broadened the scope of Title IX so that it applies institution-wide. Civil Rights Restoration Act, 20 U.S.C. § 1687 (became law on March 22, 1988). This Act directly reversed the Supreme Court's decision in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), which had limited the coverage of Title IX to specific programs or activities which actually receive federal funds.

**35.** The most common Title IX cases challenge regulations that prohibit female students from

participating in high school sports. In general, courts have had little difficulty in concluding that such regulations deny female students equal protection of the laws. *See, e.g., Brenden v. Independent School District,* 477 F.2d 1292 (8th Cir.1973); *Morris v. Michigan State Board of Education,* 472 F.2d 1207 (6th Cir.1973); *Hoover v. Meiklejohn,* 430 F.Supp. 164 (D.Col.1977).

**36.** Judge Sweet of this district applied a disparate impact analysis under Title IX in *Fulani v. League of Women Voters Educ. Fund,* 684 F.Supp. 1185 (S.D.N.Y.1988). However, he carefully *assumed* that a disparate impact is appropriate under Title IX without actually *deciding* that such was the case. *Id.* at 1193.

**37.** Many of these cases have challenged teacher competency tests as being racially discriminatory. *See generally* Rebell, *Disparate Impact of Teacher Competency Testing on Minorities: Don't Blame the Test–Takers—or the Tests,* 4 YALE L. & POL.REV. 375 (1986).

finds no persuasive reason not to apply Title VI's substantive standards to the present Title IX suit. Under analogous circumstances, one district court reasoned:

> The Title IX regulations, like the Title VI regulations at issue in *Guardians*, do not explicitly impose an intent requirement. As there is no reason that a Title IX plaintiff should have a higher burden of proof than a Title VI plaintiff, *see, e.g., Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (interpretation of Title IX dependent upon interpretation of Title VI); *Chowdhury v. Reading Hospital & Medical Center,* 677 F.2d 317 (3d Cir. 1982), *cert. denied,* 463 U.S. 1229 [103 S.Ct. 3569, 77 L.Ed.2d 1411] (1983) …, I hold that plaintiffs need not prove discriminatory intent to succeed on their claim.

*Haffer,* 678 F.Supp. at 539–540.

The Title IX implementing regulations, like the regulations promulgated under Title VI, to which Title IX is frequently compared, are consistent with this interpretation of the comprehensive reach of the statute. Several Title IX regulations specifically prohibit facially neutral policies. For example, the provision governing admissions procedures, 34 CFR § 106.21(b)(2), prohibits a recipient from

> administer[ing] or operat[ing] any test or other criteria for admission which has a disproportionately adverse effect on persons on the basis of sex unless the use of such test or criterion is shown to predict validly success in the education program or activity in question and alternative tests or criteria which do not have such a disproportionate adverse effect are shown to be unavailable.

*See also* 34 C.F.R. §§ 106.22, 106.23(b), 106.34(d), 106.37(b), 106.52, and 106.53.(b).[38]

Based upon a reading of the Title IX regulations, as well as the decisions that apply them, the Court finds that Title IX regulations, like the Title VI regulations at issue in *Guardians,* prohibit testing practices with a discriminatory *effect* on one sex. Consequently, plaintiffs need not prove intentional discrimination.

■ In Title VII testing cases, the Supreme Court developed a three-pronged formulation to analyze disparate impact claims. Under this scheme, plaintiffs first must show that a facially neutral practice has a disproportionate effect. After such a showing, the burden shifts to defendants to prove a substantial legitimate justification —a "business necessity"—for its practice. The plaintiff then may ultimately prevail by offering either an equally effective alternative practice which has a less of a discriminatory impact, or proof that the legitimate practices are a pretext for discrimination. *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Sheehan v. Purolator,* 839 F.2d 99, 104 (2d Cir.1988).[39]

In educational testing cases, instead of requiring defendants to demonstrate a "business necessity," courts have required defendants to show an "educational necessity." For example, the Eleventh Circuit, in *Georgia State Conf. of Branches of NAACP v. State of Georgia,* 775 F.2d 1403 (11th Cir.1985), held that defendants had a burden of proving that their practices in question bore "a manifest demonstrable relationship to classroom education." *Id.* at 1418. *See also Board of Education v. Harris,* 444 U.S. 130, 151, 100 S.Ct. 363,

**38.** The Tenth Circuit made a similar observation in *Mabry,* 813 F.2d at 316–17 n. 6.

**39.** Defendants' mistakenly rely upon Justice O'Connor's plurality opinion in *Watson v. Fort Worth Bank & Trust,* — U.S. ——, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827 (1988), to argue that the Supreme Court now requires a greater quantum of proof in disparate impact cases. The portion of Justice O'Connor's opinion containing the alleged change in law was only joined by three other members of the Court. Thus, it is not law. The Court's holding in *Watson,* that subjective employment practices can be challenged under disparate impact analysis, does not affect the outcome of this case.

375, 62 L.Ed.2d 275 (1979) ("educational necessity" analogous to "business necessity").

■ Applying the Title VII formulations to this Title IX case as modified to take into account "educational necessity," this Court finds that plaintiffs have demonstrated a likelihood of success on the merits. Plaintiffs have met their burden of establishing a *prima facie* case through persuasive statistical evidence and credible expert testimony that the composition of scholarship winners tilted decidedly toward males and could not have occurred by a random distribution. *See* Gray Aff. at ¶ 6; Shapiro T. at 29–30. Defendants have failed to attack plaintiffs' evidence of statewide disparate impact but have instead focused in an *ad hoc* fashion on individual schools and counties. In a case alleging statewide discrimination, such a focus does not rebut plaintiffs' statewide *prima facie* case.

Plaintiffs, moreover, have established that the probability, absent discriminatory causes, that women would consistently score 60 points less on the SAT than men is nearly zero. Gray Aff. at ¶¶ 5–7. Defendants concede that at least half of this differential cannot be explained away by "neutral" variables. Based upon the totality of evidence, then, this Court finds that plaintiffs have demonstrated that the State's practice of sole reliance upon the SAT disparately impacts young women.

Thus, to prevail, defendants must show a manifest relationship between use of the SAT and recognition and award of academic achievement in high school. The Court finds that defendants have failed to show even a reasonable relationship between their practice and their conceded purpose. The SAT was not designed to measure achievement in high school and was never validated for that purpose. Instead, in arguing that the SAT somehow measures high school performance, defendants rely upon anecdotal evidence that the SAT partially tracks what is generally learned in high school Math and English courses. This argument is meritless.

Plaintiffs have offered substantial evidence that the SATs do not mirror high school Math and English classes. The makers of the SAT describe the test as an "aptitude test;" it does not purport to measure what is learned in classrooms but to predict success in college. The testing format of the SAT measures students' ability to take tests at least as much as it measures substantive material. Defendants' claims that the SAT is an achievement test are contradicted by defendant Sobol's own recent pronouncement that SAT scores "are a measure of aptitude rather than achievement." *Appeal of Yick Moon Lee* (June 23, 1988), P. Reply Mem.Ex. 4.

Moreover, even if SATs provided a partial measurement of what is learned in high school Math and English, these two courses constitute only 20 percent of a high school student's studies. The SAT fails to provide *any* measure of what a student learns in foreign language, science, and social studies courses. Moreover, there can be no serious claim that a test given on one single morning can take into account a student's diligence, creativity and social development and work habits in that student's environment—all part of high school achievement. After a careful review of the evidence, this Court concludes that SAT scores capture a student's academic achievement no more than a student's yearbook photograph captures the full range of her experiences in high school.

■ Plaintiffs have offered an alternative to sole reliance upon the SAT: a combination of GPAs and SATs. The SED's use of this alternative in 1988 sharply reduced the disparate impact against females caused by the use of the SAT alone. A significantly greater number of female students received scholarships in 1988 than in each prior year in which the SED relied solely upon the SAT. P.App. I, Ex. 2. Defendants concede that females had a greater opportunity to receive scholarships under the combination system. Defendants also concede that grades are the best measure of high school achievement within the walls of a single school. Instead, they argue that since there is a disparity among

schools and their grading systems it is both unfair and impossible to use grades as part of the scholarship eligibility determination. Defendants plan instead to develop a state-wide achievement test. While this Court does not dispute the apparent advantages of a statewide achievement test—if indeed a valid test can be developed—it does not agree that pending the implication of such a test, use of grades would be either unfair or infeasible.

While a combination system—using both GPAs and SATs—is not a perfect alternative, it is the best alternative presently available. The SED is concerned that students in academically superior high schools not be disadvantaged by the use of GPAs. This concern is addressed by the combination system because in effect grades would be weighted by SATs. The SAT component which cannot properly itself measure achievement serves to balance the grade component that does. In this way, the SED's concern that use of grades alone will deprive good students in superior high schools of scholarships is ameliorated. Also, as a testing expert explained at the hearing, few students will be displaced if a combination system is used:

> What happens when you add GPA in with the SAT is you eliminate people who had sufficiently high SATs but low grade point averages. And they get replaced by people with slightly lower SATs who have higher—very high grade point averages. So the movement of individuals is not really all that severe, it's ... really just taking scholarships away from the high SAT performers who did not actually achieve in high school ...

Shapiro T. at 36. More importantly, the combination system would be "fair" in the larger sense of the word, because it would better advance the state's goal of awarding high school performance and would better provide *all* students—not just male students or students from selective schools—with an equal opportunity to compete for prestigious state scholarships.

Like its fairness argument, the SED's feasibility argument lacks merit. The SED contends that if it uses GPAs in awarding scholarships, the GPAs will not be in hand until February 24, 1988, the awards process will extend 16 weeks thereafter and, thus, it will be difficult to inform winners prior to college acceptance dates. The Court rejects this argument. First, based upon evidence detailing the time that is necessary to process scholarship applications, the Court finds that the awards process can be completed in substantially less than 16 weeks.[40] Second, as of the hearing before the Court on December 21, 1988, the defendants have been on notice that GPAs may be needed and on that date represented to the Court that they had commenced collection of GPAs. The defendants—not the plaintiffs or the Court—selected February 24 as the date grade calculations must be submitted to the SED, and then waited until January 13 to notify schools of that fact. The Court can only assume the SED did so consistent with using GPAs in a timely fashion and, in any event, the SED cannot use its own delay to justify continued reliance upon a discriminatory practice.

■ The SED cannot justify its discriminatory practice because any alternative would be more difficult to administer. All states giving merit scholarships awards, with the exception of New York and Massachusetts, use GPAs, without concern for either administrative difficulties, grade inflation or the comparability of grades. Lee Aff., P. Reply Mem. Ex. 5; App. I, Ex. 14. Any administrative difficulties that the SED experienced in 1988, when it used a combination system, were attributable to the SED's own failure to implement and clarify specific guidelines for the collections of grades, and to provide any enforcement mechanisms to guard against cheating. While the Court, like the amici Hewlett School District, does not condone cheating or inaccuracies in grade reporting, it is not the Court's role to police the SED's

**40.** While the Court will not play the role of administrator and detail the time saving techniques that the SED could use, the Court does note that the SED could save considerable time

if it notifies students of their awards by listing names in a New York newspaper, a procedure used successfully by the New York Board of Bar Examiners.

scholarship program. The Court notes, however, that to verify accuracy, the SED could follow the practice of many states and require school administrators to submit a signed certificate of accuracy.

■ Faced with a conflict between the SED's administrative concerns on the one hand, and the risk of substantial discriminatory harm to plaintiffs on the other, the Court has little difficulty in concluding that the balance of hardships tips decidedly in plaintiffs' favor. *See Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir.1984). The Court finds that plaintiffs have offered a feasible alternative to sole reliance upon SATs. Accordingly, the Court finds that plaintiffs have demonstrated a likelihood of success on the merits of their Title IX claim and, thus, a preliminary injunction is warranted.

### b. Equal Protection

■ Alternatively, a preliminary injunction is warranted because plaintiffs also have established a likelihood that they will succeed on their equal protection claim. The classification of scholarship applicants solely on the basis of SAT scores violates the equal protection clause of the Fourteenth Amendment because this method is not rationally related to the state's goal of rewarding students who have demonstrated academic achievement.

Under the lowest standard of equal protection review—the "rational relationship standard"—"[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985). Although considerable deference is given to the decisions of legislators and state administrators under the rational basis test, the test "is not a toothless one." *Baccus v. Karger*, 692 F.Supp. 290, 298 (S.D.N.Y.1988) (invalidating New York bar rule that required applicants for bar admission to have commenced the study of law after their 18th birthday), *citing Schweiker v. Wilson*, 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1980). In a long line of cases, the Su-

preme Court has applied rational basis scrutiny to strike down legislation where the permissible bounds of rationality were exceeded. *See e.g., Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Metropolitan Life Insurance v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

For the reasons stated above, the SED's use of the SAT as a proxy for high school achievement is too unrelated to the legislative purpose of awarding academic achievement in high school to survive even the most minimal scrutiny. The evidence is clear that females score significantly below males on the SAT while they perform equally or slightly better than males in high school. Therefore, the SED's use of the SAT as the sole criterion for awarding Regents and Empire Scholarships discriminates against females and, since such a practice is not rationally related to the legislative purpose, it unconstitutionally denies young women equal protection of the laws and must be enjoined on that ground as well.

### IV. *Conclusion*

Defendants' practice of relying solely upon SAT scores in awarding Regents and Empire Scholarships deprives young women of the opportunity to compete equally for these prestigious scholarships in violation of both Title IX and the Constitution's equal protection clause. Defendants are hereby ordered to discontinue such discriminatory practices and, instead, to award Regents and Empire Scholarships in a manner that more accurately measures students' high school achievement. For the present year, the best available alternative is a combination of grades and SATs. The SAT component is justified, not as a measure of achievement, but to weight the GPA component. The Court, however, does not limit the SED's discretion to devel-

op other alternatives in the future, including a statewide achievement test.

SO ORDERED.

Appendix:  Mean SAT Scores for College–Bound Seniors*

| | Verbal | | Math | |
|---|---|---|---|---|
| | Males | Females | Males | Females |
| 1988 | 435 | 422 | 498 | 455 |
| 1987 | 435 | 425 | 500 | 453 |
| 1986 | 437 | 426 | 501 | 451 |
| 1985 | 437 | 425 | 499 | 452 |
| 1984 | 433 | 420 | 495 | 449 |
| 1983 | 430 | 420 | 493 | 445 |
| 1982 | 431 | 421 | 493 | 443 |
| 1981 | 430 | 418 | 492 | 443 |
| 1980 | 428 | 420 | 491 | 443 |
| 1979 | 431 | 423 | 493 | 443 |
| 1978 | 433 | 425 | 494 | 444 |
| 1977 | 431 | 427 | 497 | 445 |
| 1976 | 433 | 430 | 497 | 446 |
| 1975 | 437 | 431 | 495 | 449 |
| 1974 | 447 | 442 | 501 | 459 |
| 1973 | 446 | 443 | 502 | 460 |
| 1972 | 454 | 452 | 505 | 461 |
| 1971 | 454 | 457 | 507 | 466 |
| 1970 | 459 | 461 | 509 | 465 |

* 1988 Profile of the SAT (ETS), P. App. 1, Ex. 7.