Sanford GRIMES and Janelle Grimes, Minors, By and Through Lynda GRIMES and Sanford Grimes, their next friends, et al., Plaintiffs,

v.

Thomas SOBOL, Commissioner of Education of the State of New York, The New York State Education Department, Joseph A. Fernandez, Chancellor, New York City Public Schools, New York City Board of Education, Defendants.

No. 90 CV 4539 (KMW).

United States District Court, S.D. New York.

Sept. 14, 1993.

Joseph Fleming, New York City, for plaintiffs.

Clement J. Colucci, Robert Abrams, Atty. Gen., New York City, for State.

David L. Lock, Peter Sherwood, Corp. Counsel, City of New York, New York City, for City.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Plaintiffs filed this action as part of their attempt to require New York City public schools to teach a curriculum that gives greater weight to the contributions of Africans and African Americans. Their desire for curricular reform has brought them to this court, they explain, because it is their forum of last resort: "[plaintiffs] come to this Court because they have no place else to go

where they can find relief.... [N]early everyone else who can bring about change in the education system is worried about a job or a vote." Pls.Mem.Opp. at 4. Defendants, in contrast, argue that none of statutes relied upon by plaintiffs provides a basis for recovery. It is true that the independence of the federal courts permits them to resolve controversial and emotional disputes in an atmosphere free of the political pressures of the day. That independence, however, does not empower courts to decide all disputes that are seen as so emotionally or politically charged that they defy resolution elsewhere. Because neither the United States Constitution nor federal statutes—the sources from which this court derives its authority—provide a basis for relief, I must grant defendants' motion to dismiss the amended complaint.

### Background

Plaintiffs' amended complaint represents their second attempt to state a cause of action upon which relief can be granted.[1] Plaintiffs purport to bring this action on behalf of a class of all African–American public school students in New York City. They allege that the curriculum of the New York City public schools injures African Americans because it is systematically biased against them; they allege that the curriculum:

distorts and demeans the role of African Americans and excludes the existence, contributions, and participation of African Americans in the various aspects of world and American culture, sciences, history, arts and other areas of human endeavor, resulting in emotional and psychological harm denying Plaintiffs the full and equal benefits of public education and subjecting Plaintiffs to discrimination under a program receiving federal financial assistance.

Amended Complaint ¶ 2. Plaintiffs also allege that the curriculum's "systemic bias" against African Americans disparately im-

1. Plaintiffs' original complaint alleged causes of action under 42 U.S.C. §§ 1981 and 1983, and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq. For the most part, the original complaint contained the same factual allegations as in the amended complaint at issue here. On March 12, 1992, the court issued a Memorandum Opinion and Order granting defendants' motions to dismiss the original complaint for failure to state a claim upon which relief can be granted 786 F.Supp. 1184. The court granted plaintiffs leave to replead their claims to remedy the deficiencies identified in the original complaint.

pacts upon the putative plaintiff class, and future school-age children, by denying them the benefits provided to white students. *Id.* ¶¶ 8, 10.[2] Plaintiffs are not arguing that there is a different curriculum for African–American students or that fewer resources are devoted to teaching the curriculum to African–American students as compared with non-African-American students. Rather, plaintiffs' amended complaint alleges that the content of the curriculum has a disparate impact on African Americans' self esteem and ability to learn. Plaintiffs assert a claim under 42 U.S.C. § 1983, arguing that the present curriculum violates the Due Process and Equal Protection clauses of the Fourteenth Amendment, and assert a claim under the regulations implementing Title VI, 34 C.F.R. § 100 *et seq.* (1991).

Plaintiffs seek a declaration that the curriculum is discriminatory and an injunction barring defendants from perpetuating the allegedly racially discriminatory aspects of the curriculum. They also seek an order directing defendants to submit a revised curriculum "which includes the existence, true participation and contributions of African Americans and other non-whites ... and which would eliminate the discriminatory aspects of the existing public school curriculum...." *Id.* ¶ 3 ("Prayer for Relief").

Defendants now move to dismiss the amended complaint on the ground that it, like its predecessor, fails to state a claim upon which relief can be granted. Defendant New York State Education Department ("NYSED") also moves to dismiss on the

ground that it is immune from suit in the federal courts. The court first addresses the immunity of defendant New York State Education Department ("NYSED") to suit. The court then addresses the adequacy of plaintiffs' claim under § 1983, and the adequacy of their claims under the regulations implementing Title VI.

## Discussion

### 1. *Immunity from Suit*

NYSED argues that the Eleventh Amendment bars plaintiffs' suit in its entirety against NYSED. State Defs.Mem.Opp. at 9–11. NYSED correctly states that a State and its agencies are immune from suit in federal court unless the State consents or Congress enacts legislation abrogating the State's Eleventh Amendment immunity. *Id.* at 10. NYSED ignores, however, the fact that Congress explicitly abrogated the states' immunity from suits in federal court alleging violations of Title VI of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000d–7(a) (West's Supp.1993).[3] Moreover, NYSED made this same, baseless argument for immunity four years ago in *Sharif v. New York State Education Dept.,* 709 F.Supp. 345, 358 (S.D.N.Y. 1989), where then-District Judge Walker held that Congress had eliminated NYSED's immunity. NYSED's citation to, and discussion of, *Sharif* in its supplemental brief makes its failure to retract its position on the immunity issue even more inexplicable. Contrary to NYSED's erroneous assertion, it is *not* immune from suit where, as here, plaintiffs allege violations of Title VI and its regulations.[4]

**2.** Plaintiffs allege that the "detrimental and disparate impact" of the allegedly biased curriculum contributes to the following harms to the African–American student population: 1) low self-esteem; 2) poor academic performance; 3) high drop-out rate; 4) high crime rate; 5) high degree of anti-social behavior; 6) high rate of unemployment; and 7) high rate of emotional and psychological problems. Amended Complaint ¶ 11a–g.

**3.** The section states in full: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 794 of Title 29, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions

of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d–7(a) (West's Supp. 1993)

Congress also provided that the states' immunity would be abrogated with respect to "violations that occur in whole or in part after October 21, 1986." 42 U.S.C. § 2000d–7(b). The State has no basis for arguing that the violations alleged here concluded prior to October 21, 1986.

**4.** NYSED is correct in arguing that, as a state agency, no cause of action can be brought against it under 42 U.S.C. § 1983. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, plaintiffs' § 1983 claim against NYSED must be dismissed.

## 2. Section 1983

■ In its earlier opinion, the court explained the rule of law that determines whether plaintiffs state a claim under § 1983. 786 F.Supp. at 1191–93. To state a claim for discrimination that is actionable as a constitutional violation, plaintiffs must assert that "the decision maker ... selected or reaffirmed a particular course of action at least in part *because of* not merely *in spite of* its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (emphasis added).

■ Plaintiffs make three arguments in support of their allegation that discriminatory *purpose* was a motivating factor in defendants' actions.[5] First, plaintiffs argue that defendants' "failure and refusal to quickly and fully embrace a curriculum inclusive of Africans and African Americans is a failure and refusal based on race, and that such failure and refusal is conscious, and therefore, intentional." *Id.* Second, plaintiffs imply that purposeful discrimination can be inferred from the fact that the New York City Board of Education implemented a Holocaust Curriculum and an Italian Heritage Curriculum, but did not adopt a special curriculum to focus on issues of particular importance to African Americans. *Id.* at 7. Third, plaintiffs argue that the lack of progress in changing the curriculum since this action was commenced three years ago supports an inference of racially discriminatory intent. *Id.* at 3.

■ In response to the first two arguments, to the extent that plaintiffs argue that constitutionally impermissible intentional discrimination may be inferred from (1) the conscious failure to adopt a curriculum that includes more material regarding Africans and African Americans, or (2) defendants'

responsiveness to other groups' special needs, their allegations are inadequate to sustain this inference. Plaintiffs have failed to come forward with the specific allegations of fact necessary to sustain the claim that a discriminatory *purpose* was a motivating factor in any actions taken by defendants—that is, that the curriculum was adopted *because* of, not merely *in spite* of, its allegedly detrimental effects on African American students. In alleging a claim under § 1983 based on a constitutional violation, the "[d]iscriminatory purpose" with which a defendant must have acted "implies more than intent as volition or intent as awareness of the consequences." *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. Although I recognize the thinness of this distinction and the difficulty one could expect to encounter in proving that a school *intended* such detrimental effects (as opposed to *intending* to adopt a *curriculum,* the by-products of which are allegedly detrimental effects), there is no doubt that appellate decisions require plaintiffs to demonstrate that the curriculum was adopted *because of* its allegedly detrimental effects on African–American students, and not merely with *awareness of* such effects. *See Soberal–Perez v. Heckler,* 717 F.2d 36, 42 (2d Cir.1983) (dismissing constitutional challenge to defendant's failure to provide Spanish language services where plaintiffs alleged that such failure had detrimental effect on Hispanics, but plaintiffs could not "allege in good faith, much less prove, any other evidence of discriminatory intent" other than a legitimate preference for English over all other languages); *Lora v. Bd. of Educ.,* 623 F.2d 248, 250 (2d Cir.1980) (standing alone, evidence of a foreseeable, detrimental result from an action is not sufficient to establish the requisite discriminatory intent on the part of the school board); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450

---

5. In their affidavits and memorandum in opposition to defendants' motion to dismiss, plaintiffs add additional factual allegations not present in their amended complaint. On a motion to dismiss, the court may treat the new factual assertions as an amendment to the complaint. *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 26 (2d Cir.1988). Defendants NYSED and Sobol note this option and argue that the further amended complaint fails to state a claim upon which relief can be granted. State Defs. Reply Mem. at 7. Rather than converting the motions into motions for summary judgment, the court (1) treats all of plaintiffs' additional factual assertions as if they had been established and (2) treats defendants' motions as motions to dismiss a further amended complaint pursuant to Fed.R.Civ.P. 12(b)(6).

(1977) (absent a clear pattern of state action unexplainable on grounds other than an intent to discriminate on the basis of race, disproportionate impact alone does not establish invidious racial discrimination).

Plaintiffs' third argument is that defendants' alleged inaction since the commencement of this lawsuit establishes discrimination. Notice of a lawsuit may bring the alleged detrimental effects to defendants' attention; however the court may not infer an intent to discriminate from awareness of allegedly detrimental effects alone, for the reasons stated above.

■ The court must, therefore, again dismiss plaintiffs' claims under § 1983 for failure to adequately allege intentional discrimination.[6]

### 3. Regulations Implementing Title VI

As noted above, plaintiffs' original complaint alleged a causal relationship between the present New York City public school curriculum and harm to the members of the putative plaintiff class, but did not allege the intent required to state a cause of action pursuant to the Constitution or Title VI.[7] The court granted plaintiffs leave to plead a claim under the regulations implementing Title VI (the "Regulations") because the Regulations do not require an allegation of discriminatory intent. 786 F.Supp. at 1193. Plaintiffs amended their complaint to allege just such a violation, but, for the following reasons, their claim is not actionable under the Regulations.

**6.** Having failed to allege the intentional discrimination needed to sustain a constitutional claim, plaintiffs also fail to state a cause of action directly under Title VI. *See Fulani v. League of Women Voters Educ. Fund*, 684 F.Supp. 1185, 1193 (S.D.N.Y.1988) (failure to allege intentional discrimination warrants dismissal of Title VI claim), *aff'd*, 882 F.2d 621 (2d Cir.1989).

**7.** Title VI states in part: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (1981).

As this court explained in its earlier opinion, the Supreme Court acknowledged the existence of a cause of action under the Regulations for claims based on disparate impact, as well as disparate treatment. *See Alexander v. Choate*, 469 U.S. 287, 293 nn. 8, 9, 105 S.Ct. 712, 716 nn. 8, 9, 83 L.Ed.2d 661 (1985). A recipient of federal financial assistance, such as the New York City Board of Education, may not "provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program" on the basis of race, color, or national origin. 34 C.F.R. § 100.-3(b)(1)(ii) (1992).[8] The complementary, disparate *impact* provision states that:

A recipient, in determining the types of services,

financial aid or other benefits ... which will be provided under any such program ... **may not ... utilize criteria or methods of administration which have the effect** of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

*Id.* at § 100.3(b)(2) (emphasis added). The term "program" is defined to include "any program, project or activity for the provision of services ... or other benefits to individuals (including education or training ...)...." *Id.* at § 100.13(g).

Defendants argue that the factual scenario painted by plaintiffs, even if proven, does not violate § 100.3(b)(2).[9] Defendants claim that

**8.** The Regulations elaborate on the types of discriminatory practices covered by Title VI. Other examples of discrimination include (1) determining the site or location of facilities with the effect of excluding individuals based on race, *see* 34 C.F.R. § 100.3(b)(3), and (2) denying a person the opportunity to participate as a member of a planning or advisory body on the ground of race. *See id.* at § 100.3(b)(1)(vii).

**9.** Although defendants New York City Board of Education and Joseph Fernandez submitted their own memorandum in support of their motion to dismiss, they join in the arguments made by the State Defendants (NYSED and Thomas Sobol). City Defs.Mem.Supp. at 9.

that regulation does not reach the conduct complained of by plaintiffs, because the prohibition against "criteria or methods of administration" that have a racially discriminatory effect does not extend to the regulation of the *content* of a school's curriculum. State Defs.Mem.Opp. at 5–6. Defendants read § 100.3(b)(2) as applying to administrative decisions regarding the allocation of resources and access to programs, but not to the content of curriculum. *Id.* at 7.

Plaintiffs respond by asserting that "[c]urriculum is a 'method of administration' and its design, implementation and application, when resulting in a discriminatory impact is clearly prohibited" under § 100.3(b)(2). Pl. Mem.Opp. at 11. Plaintiffs alternatively argue that under a regime of compulsory school attendance,

> [w]hile Plaintiffs are taught that they are inferior, that they and their people have accomplished little to nothing, they are being subjected to ... treatment [that] is separate and unequal from the treatment Caucasian students are accorded in the same course of instruction.

*Id.* at 12.

The court's analysis begins with the language of the Regulations and the decisions interpreting that language. A violation of the Regulations is stated when the "criteria or methods of administration" used in determining the types of benefits or services to provide have the effect of discriminating on the basis of race. The Regulations are not violated by proof that the educational services provided by a school system are disproportionately less beneficial to members of one race than another *unless* the reason for that disparate impact is that the school system selected discernable administrative policies that, although facially neutral, are the functional equivalent of purposeful racial discrimination. *See Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988) (premise of disparate impact approach is that a practice may in operation be "functionally equivalent to intentional discrimination") (plurality opinion).

The court must determine whether, as plaintiffs allege, the selection of an emphasis on European history, for example, constitutes "criteria or methods of administration" actionable under the Regulations. This issue may be resolved by looking at the decisional law interpreting § 100.3(b)(2), the legislative and administrative history of Title VI and comparable statutes, and the present interpretive position of the Office for Civil Rights of the United States Department of Education, the agency responsible for enforcing the provisions of Title VI.

## A. Decisional Law

The reported decisions interpreting § 100.-3(b)(2) do not address whether the Regulations extend to cover curricular content; rather, these decisions address the propriety of tests and policies to determine admission and placement into school programs. For example, the use of I.Q. tests to identify students to be placed in "dead-end" classes for the educable, mentally retarded violated the Regulations implementing Title VI, because the use of the test resulted in a disproportionately high number of minority students being placed in these classes. *See Larry P. v. Riles,* 793 F.2d 969, 980, 983 (9th Cir.1984). Similarly, the practice of achievement grouping of students can be attacked as violating the Regulations under Title VI because the composition of classrooms did not reflect a random population distribution. *See Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th Cir.1985). Also, the practice of permitting each school district to establish its own criteria for determining English proficiency can be attacked as violating Title VI Regulations, because this practice allegedly resulted in a failure to properly identify those in need of language assistance. *See Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1044–45 (7th Cir.1987). More recently, Alabama's practice of requiring a minimum score on the American College Testing Program's ("ACT") examination for admission to undergraduate teacher training programs was found to violate § 100.3(b)(2); there was an insufficient justification for relying on the ACT cut-off score as a "valid measure of the minimal ability necessary to become a competent teacher," and reliance on the score

had a disparate impact on African Americans. *Groves v. Alabama State Board of Education,* 776 F.Supp. 1518, 1530 (M.D.Ala. 1991). In sum, these decisions pertain to admissions and testing policies designed to identify which students are to benefit from school programs; these decisions do not speak directly to the applicability of the Regulations to curriculum choices.

## B. Administrative History of Title VI Regulations

Because of the lack of case law on the issues presented here, I asked the parties to submit additional briefs concerning four issues the court deems relevant in ruling on the scope of the Title VI Regulations, including whether any administrative or legislative history offers any further guidance as to what was meant by the phrase "criteria or methods of administration." May 10, 1993 Order.

The scant administrative history of the Regulations, when originally adopted and as amended, does not address the issue of curricular content. *See* 29 Fed.Reg. 16298–16316 (1964) (original Regulations); 33 Fed.Reg. 4955–56 (1968); 35 Fed.Reg. 11595–96 (1970). The administrative history of the Regulations supports the generally agreed upon proposition that the Regulations require schools to provide students with "the opportunity to obtain the education generally obtained by other students in the system." 33 Fed.Reg. 4956. There is, however, no support in the administrative history of the Regulations implementing Title VI for the proposition that the Regulations extend to overseeing the content of school curricula.

## C. Relevance of Regulations Implementing Title IX

Given the dearth of guidance from the administrative history of Title VI, I also asked the parties to address the relevance of the regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*[10] In 1975, when the Department of Education (the "Department")[11] adopted the final version of regulations implementing Title IX, the Department stated that Title IX "is similar" to Title VI of the Civil Rights Act of 1964 in proscribing discrimination in federally funded schools, "except that Title IX applies to discrimination based on sex," 40 Fed.Reg. 24128 (1975), while Title VI is restricted to race, color and national origin discrimination. Courts have often noted the similarity in purpose and construction of Title VI and Title IX, and have found the Title VI Regulations instructive in interpreting Title IX and its accompanying regulations. *See, e.g., Cannon v. University of Chicago,* 441 U.S. 677, 694–98, 99 S.Ct. 1946, 1956–58, 60 L.Ed.2d 560 (1979); *Mabry v. State Board of Community Colleges and Occupational Educ.,* 813 F.2d 311, 317 (10th Cir.), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Sharif,* 709 F.Supp. at 360–61. Likewise, courts have consistently found language of Title IX decisions applicable to Title VI cases. *See Chowdhury v. Reading Hospital & Medical Center,* 677 F.2d 317, 319 n. 2 (3rd Cir.1982), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983); *Neighborhood Action Coalition v. City of Canton,* 882 F.2d 1012, 1015 (6th Cir.1989).

The Title IX regulations include the following provision:

Nothing in this Regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials.

34 C.F.R. § 106.42 (1992). This provision did not appear in the original version of the regulations proposed on June 20, 1974. The Department explained in the Federal Register that it made changes to the original proposed regulations in response to comments that it received during 1974. *See* 40

---

10. Subject to several exceptions, Title IX states in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a) (1990).

11. The Department of Education was formerly known as the Department of Health, Education and Welfare.

Fed.Reg. 24128 (1975). Discussing this change, the Department stated:

> The last substantive change in Subpart D is the addition of specific exemption of textbooks and curricular materials from the scope of the regulation. The new section explicitly states **the Department's position that title IX does not reach the use of textbooks and curricular materials on the basis of their portrayals of individuals in a stereotypic manner or on the basis that they otherwise project discrimination against persons on account of their sex.** As stated in the preamble to the proposed regulation, the Department recognizes that sex stereotyping in textbooks and curricular materials is a serious matter. However, the imposition of restrictions in this area would inevitably limit communication and would thrust the Department into the role of Federal censor. **There is no evidence in the legislative history that the proscription in title IX against sex discrimination should be interpreted as requiring, prohibiting, or limiting the use of any such material.** Normal rules of statutory construction require the Department, wherever possible, to interpret statutory language in such a way as to avoid potential conflicts with the Constitution. **Accordingly the Department has construed title IX as not reaching textbooks and curricular materials on the ground that to follow another interpretation might place the Department in a position of limiting free expression in violation of the First Amendment.**

*Id.,* at 24135 (emphasis added). The Department took this position after receiving comments both in favor of and against the inclusion of textbooks and curricular materials within the scope of the Title IX regulations. *See id.* The Department has thus chosen to interpret Title IX as not extending to such claims when gender discrimination is alleged. The First Amendment concerns cited by the Department for its position would appear equally applicable to Title VI claims where racial discrimination is alleged.

■ I also invited the Department of Education to submit an *amicus* brief articulating its position on the applicability of the Title VI Regulations to plaintiffs' claims.[12] May 18, 1993 Request for the Filing of a Brief, as *Amicus Curiae.* The Department responded by a letter to the court dated July 23, 1993 from Ms. Paula Kuebler, Regional Civil Rights Director, Region II, Office for Civil Rights, United States Department of Education ("Department Letter") (attached as Appendix A to this Opinion and Order). In its letter, the Department stated its position that in enforcing Title VI, it has

> on occasion, intervened in what may be fairly described as curriculum matters. In all such cases, however, the formal concern of the Department has been in ensuring equality of access to what was being taught, rather than with the intrinsic content or purpose of the instruction.

Department Letter at 1. The Department has thus taken the position that plaintiffs' claims here are not claims covered by the Regulations implementing Title VI, a position that is entitled to some deference by this court.[13]

---

**12.** The court asked the Department to state its formal position in part because the court discovered a curriculum-related Letter of Findings ("LOF") issued by the Office for Civil Rights following the Department's investigation of a complaint against New York City Technical College. The latter complaint alleged *inter alia* that the complainant was awarded a failing grade because he was black and that the course he failed focused on "caucasian biochemistry" at the expense of that of other races and ethnic groups. Region II, Office for Civil Rights LOF No. 02–91–2058 (Dec. 18, 1991). The LOF stated that the Department investigated these claims and found no evidence of racial discrimination under the Regulations. The court sought the Department's formal position, because this LOF

implied that teaching a course focusing on diseases affecting caucasians and ignoring diseases affecting minorities is conduct proscribed by the Regulations. The Department Letter responded that the "[i]t might have been proper to dismiss that part of the complaint that charged 'caucasian biochemistry' was being taught." Department Letter at 2. The Department did not dismiss the claim in its entirety, because the charge that the complainant failed because he was black did state a claim under the Regulations, which required an investigation by the Department. *Id.*

**13.** The court notes that, although the Department's interpretation of its own regulations embodied in the form of a formal adjudication or

The court is asked to resolve a question of first impression—whether the Title VI Regulations extend to regulating the content of school curricula. No one source provides a definitive answer to this question. However, upon a review of the language of § 100.3(b)(2), the decisional law, the administrative history of Title VI and Title IX, and the Department's interpretive position, the court concludes that the Regulations, as they have been construed by the courts and the Department, do not encompass the regulation of curricular content.

## Conclusion

For the reasons stated above defendants' motions to dismiss are granted. The Clerk of the Court is hereby directed to dismiss the amended complaint.

SO ORDERED.

### APPENDIX A

UNITED STATES DEPARTMENT
OF EDUCATION

REGION II

FEDERAL BUILDING

26 FEDERAL PLAZA

NEW YORK, NEW YORK 10278

OFFICE FOR CIVIL RIGHTS

July 23 1993

Honorable Judge Kimba M. Wood

U.S. District Court

Southern District of New York

480 Foley Square

New York, New York 10007

Dear Judge Wood:

In your request to Ms. Agnes Northern, of my staff, dated May 18, 1993, you asked for a statement of Department of Education policy in regard to the reach of Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d, in cases involving allegations of discriminatory course content. You asked for this information to assist you in resolving a motion pending before you in *Grimes v. Sobel,* 90 Civ. 4539 (KMW), to dismiss for failure to state a justiciable claim. This letter responds to your request.

In *Grimes,* plaintiffs had alleged that the curriculum for the New York City public schools violated Title VI because it failed to portray the contributions of African–Americans accurately and fairly, resulting in emotional and psychological harm to the plaintiffs. The threshold issue raised by the defendant's motion to dismiss was whether Title VI can be violated by course content alone. In your request, you note that this office issued a letter of findings (LOF) in Office for Civil Rights (OCR) Case No. 02–91–2058, dated December 18, 1991, a case investigated by OCR to determine whether a course at the New York City Technical College violated Title VI. As discussed below, the referenced OCR complaint investigation does not appear to have raised matters that have a bearing on the case before you.

OCR has, on occasion, intervened in what may be fairly described as curriculum matters. In all such cases, however, the formal concern of the Department has been in ensuring equality of access to what was being taught, rather than with the intrinsic content or purpose of the instruction. Thus, for example, in enforcing Title VI and its regulation, OCR has required elementary and secondary schools and vocational education institutions to afford English-as-a-second-language instruction and to make other adjustments to curricula to accommodate national-origin-minority students who have not learned English. Failure of institutions, whose services or benefits are otherwise generally available to all individuals within a particular area, to afford such services can have the effect of exclusion on the basis of

rulemaking would be entitled to great deference, *see Chevron U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), here the Department's interpretation of the Title VI Regulations is embodied in an amicus letter. A department position stated *amicus curiae* is instructive, but is not afforded controlling weight. *See Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 427 n. 19 (D.C.Cir. 1992).

national origin. *See Lau v. Nichols,* 414 U.S 563 (1974).

The OCR case regarding the New York City Technical College was investigated to determine whether the student-complainant had been the victim of discrimination. The complainant had alleged that a failing grade was awarded because the complainant was black. The complainant also alleged that "caucasian biochemistry" had been taught in the course the complainant failed.

It might have been proper to dismiss that part of the complaint that charged "caucasian biochemistry" was being taught. Notwithstanding, the complainant had clearly charged that the instructor had awarded a failing grade on the basis of race. As the LOF disclosed, no discrimination was found. The final examination was machine-graded. The only changes made to the score afforded the complaining student and others credit for questions that a substantial number of students had answered incorrectly. Thus, the referenced complaint investigation does not appear to have a bearing on the issues before the Court in *Grimes.*

I hope this information pertaining to OCR policy and its actions in the referenced administrative case may be helpful to the Court.

Sincerely,
[Signature]
for Paula Kuebler
Regional Civil Rights Director
Region II